J-S17001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: C.B.H., A MINOR<br><br>APPEAL OF: J.A.H., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 2637 EDA 2018 |

Appeal from the Order Entered August 9, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0001086-2017

| | |
|---|---|
| IN THE INTEREST OF: C.B.H., A/K/A S.H.,A MINOR<br><br>APPEAL OF: J.A.H., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 2638 EDA 2018 |

Appeal from the Order Entered August 9, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP00000179-2018
FID: 51-FN-002317-2016

| | |
|---|---|
| IN THE INTEREST OF: C.A.H., A/K/A C.H., A MINOR<br><br>APPEAL OF: J.A.H., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 2640 EDA 2018 |

Appeal from the Order Entered August 9, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000180-2018
FID: 51-FN-002317-2016

| | |
|---|---|
| IN THE INTEREST OF: C.A.H., A MINOR<br><br>APPEAL OF: J.A.H., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 2642 EDA 2018 |

Appeal from the Order Entered August 9, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-DP-0002392-2016
FID: 51-FN-002317-2016

BEFORE:  BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 29, 2019**

J.A.H. ("Father") filed separate appeals from the orders entered on August 9, 2018, that granted the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights and to change the permanency goals from reunification to adoption for Father's minor children, C.A.H., born in May of 2016, and C.B.H., born in April of 2017 (collectively "Children").[1, 2]  Following our review, we affirm the orders on appeal.[3]

The trial court set forth the following extensive factual and procedural history of this case, stating:

---

[1] In its opinion, the trial court identifies C.A.H. as Child 1 and C.B.H. as Child 2.

[2] The parental rights of B.S.D. ("Mother") to Children were also terminated on the same date and the goal for Children was changed to adoption.  Mother filed appeals from these orders, which were affirmed by this Court in a memorandum decision filed on April 1, 2019.  ***See In the Interest of: C.'T.B.H. and C.'J.A.H.***, Nos. 2615, 2616, 2618 and 2619 EDA 2018, unpublished memorandum (Pa. Super. filed April 1, 2019).

[3] This Court consolidated Father's four appeals *sua sponte* in that they involve related parties and issues.  ***See*** Pa.R.A.P. 513.

DHS became involved with this family [o]n August 28, 2016, when DHS received a General Protective Services ("GPS") report that alleged Father and B.D. ("Mother") left Child 1 in the care of Paternal Grandmother, who was unable to care for Child 1 on a long-term basis; Father was unemployed; Father was unresponsive to DHS's attempts to contact him; Father resided with Paternal Aunt. DHS later received additional allegations that Mother and Father would leave Child 1 in the care of various relatives and would return to retrieve Child 1 without notice to the caregivers. On September 1, 2016, DHS reached Mother via telephone and Mother stated that Child [1] was residing with [P]aternal [A]unt. On September 6, 2016, DHS visited the home of Paternal Aunt. Paternal Aunt stated that she was unaware of Father's whereabouts and DHS advised Paternal Aunt that Child 1 should be taken to DHS. DHS also contacted Mother on September 6, 2016, and Mother indicated that Father had retrieved Child 1 from Paternal Aunt's home and that she was unaware of the whereabouts of Father and Child 1.

On October 28, 2016, DHS filed a Motion to Compel Cooperation with the investigation of the August 28, 2016 GPS report ("Motion to Compel"). On November 7, 2016, a hearing pursuant to the Motion to Compel occurred. Father was not present for this hearing. Father was ordered to cooperate. The trial court ordered that DHS obtain an Order of Protective Custody ("OPC") for Child 1, if necessary. The trial court also issued a stay-away order against Father as to Child 1.

On November 25, 2016, DHS visited Mother and Child 1 at the home of Maternal Grandmother. DHS determined the home to be safe and appropriate. Mother informed DHS that Father had repeatedly left Child 1 at the police station. DHS subsequently advised Mother to not leave Child 1 in Father's care.

DHS received a GPS report on November 28, 2016, alleging that Child 1 was in the custody of the 18th District Philadelphia police officers; Mother left Child 1 in the street with cars approaching in order to continue an argument with Father inside a nearby home; Child 1 was supposed to be in the care of Paternal Grandmother; Paternal Grandmother arrived at the police station to retrieve Child 1 and has agreed to care for her; police were concerned that Paternal Grandmother would allow Mother to care for Child 1; [and] Father lacked stable housing. This report was determined to be valid. Subsequently, the police transported Child 1 to DHS. Police informed DHS that an unknown individual found Child 1 in

- 3 -

a car seat placed in the street and transported her to the police station, and that the 18th District police officers had recognized Child 1 because it was the third incident in which Child 1 had been left at the police station. On that same day, DHS interviewed Mother and Maternal Grandmother via telephone and both Mother and Maternal Grandmother denied the allegations of the November 26, 2016[] GPS report. DHS could not contact Father regarding the allegations because Father failed to provide DHS with a working phone number. Following the telephone interviews, DHS obtained an Order of Protective Custody ("OPC") for Child 1. Child was subsequently placed in a foster home through Catholic Social Services.

On November 30, 2016, a shelter care hearing was held for Child 1. Father was present for this hearing. The trial court lifted the OPC, ordered the temporary commitment to DHS to stand, lifted the stay-away order, and referred Father to the Clinical Evaluation Unit ("CEU") for a forthwith drug and alcohol screen. Father was permitted to have one supervised, line-of-sight-visit with Child 1 prior to the adjudicatory hearing, separate from Mother. Father's forthwith drug screen was positive for benzodiazepines, marijuana, and opiates. Father also tested positive for marijuana on December 8, 2016. On December 13, 2016, the trial court adjudicated Child 1 dependent and fully committed Child to DHS. Father was not present for this hearing. Father was ordered to follow the recommendations of the CEU and the trial court referred Father to the CEU for three random drug screen[s] prior to the next court date. The trial court ordered Father to attend twice weekly supervised, line-of-sight and line-of-hearing visits with Child 1 at the agency.

On February 5, 2017, an initial Single Case Plan ("SCP") was created. Father's objectives were to have supervised line-of-sight visits with Child 1 at the agency; go to the CEU for three random drug screens prior to the next court date; attend counseling at the Achieving Reunification Center ("ARC"); utilize resources at ARC; [and] attend ARC for assistance with finding employment. On March 13, 2017, the trial court referred Father to CEU for a forthwith drug screen, three random drug screens, an assessment, and monitoring.

On April 23, 2017, DHS received a GPS report that alleged the family was involved with the Community Umbrella Agency ("CUA"); Mother gave birth to Child 2 at the University of Pennsylvania Hospital ("UP Hospital") on April 21, 2017[,] at 37

weeks gestation; Child 2 weighed under five pounds; Child 2 had an Appearance, Pulse, Gestation, Activity and Respiration ("APGAR") score of 9 out of 10; Mother tested positive for marijuana; Mother and Father were arguing loudly in the UP Hospital; UP Hospital staff had [to] ask Father to leave; Mother later asked UP Hospital staff if Father could return but UP Hospital denied her request; Child 2 and Mother were scheduled to be medically discharged on April 24, 2017; [and] Mother denied domestic violence issues with Father. This report was determined to be valid. On April 24, 2017, DHS visited the hospital and learned that Child 2 was not suffering from withdrawal symptoms and Child 2 was ready to be medically discharged. Mother informed DHS that she planned on obtaining a Protection From Abuse ("PFA") order against Father. On that same day, DHS visited the home of Maternal Grandmother. DHS determined that Maternal Grandmother was not an appropriate caregiver for Child 2, who remained in the hospital so that Mother could locate possible kinship resources to care for Child 2. On April 25, 2017, DHS visited the home of Maternal Aunt. DHS conducted a home evaluation and deemed Maternal Aunt to be an appropriate caregiver for Child 2. Father was present for this home assessment. Mother stated that she and Father wanted Maternal Aunt to continue caring for Child 2 and that she wanted to relinquish her rights to Child 2. Maternal Aunt agreed to continue caring for Child 2 and requested that if Father had any visitation with Child 2, Father was to be supervised. Maternal Aunt also indicated that Mother and Father had a history of domestic violence. Subsequently, DHS obtained an[] OPC for Child 2 and Child 2 was placed with Maternal Aunt.

On April 27, 2017, a shelter care hearing was held for Child 2. Father was not present for this hearing. The trial court lifted the OPC, ordered the temporary commitment to DHS to stand, and referred Father to the CEU for a forthwith drug screen. On May 9, 2017, the trial court adjudicated Child 2 dependent, discharged the temporary commitment, and fully committed Child 2 to DHS. The trial court referred Father to the CEU for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens prior to the next court date. Father was ordered to have supervised visits at the agency with Child 2. Father was present for this hearing.

On May 16, 2017, the SCP was revised. Father's objectives remained the same. On June 12, 2017, a permanency review hearing was held for Child 1. Father was not present for this

hearing. Father was re-referred to the CEU for a drug screen, assessment, monitoring, and three random drug screens prior to the next court date. Father was also referred to the ARC. On that same day, Father went to the CEU for a drug screen and tested positive for marijuana.

On July 31, 2017, a permanency review hearing was held for Child 2. Father was not present for this hearing. The trial court found Father to be non-compliant with the permanency plan and learned that Mother was discharged from the ARC due to non-participation. The trial court referred Father to the CEU for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens prior to the next court date, when he availed h[im]self.

On August 24, 2017, the SCP was revised. Father's objectives remained the same. On September 11, 2017, a permanency review hearing was held for Children. The trial court found Father to be minimally compliant with the permanency plan and referred Mother to the CEU for a dual diagnosis assessment, a forthwith drug screen, and three random drug screens prior to the next court date.

Child 1 entered DHS care on November 28, 2016, and Child 2 has been in DHS care since April 25, 2017. Father has failed to consistently comply with his objectives and comply with court orders throughout the life of the case. DHS filed a petition to involuntarily terminate Father's parental rights and change Children's permanency goal to adoption on March 9, 2018.

On August 9, 2018, the trial court held the termination and goal change trial for Children. Father was present for this trial. The trial court found clear and convincing evidence to change the permanency goal to adoption and to involuntarily terminate Father's parental rights under 23 Pa.C.S.[] § 2511(a)(1), (2), (5), (8), and (b). On April 23, 2018, Father's Counsel filed this appeal on behalf of Father.

Trial Court Opinion (TCO), 10/15/18, at 1-5 (footnotes omitted).

Father raises the following issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant [Father] under 23 Pa.C.S.[] § 2511(a)(1)?

- 6 -

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant [Father] under 23 Pa.C.S.[] § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant [Father] under 23 Pa.C.S.[] § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant [Father] under 23 Pa.C.S.[] § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.[] § 2511(b), that termination of Appellant [Father's] parental rights best serves [Children's] developmental, physical and emotional needs and welfare?

Father's brief at 5.[4]

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the

_____

[4] Although Father appealed from the two termination orders and the two goal change orders, his statement of errors complained of on appeal alleges no errors related to the change in the goal from reunification to adoption. Moreover, his list of issues in his brief again makes no mention of the goal change. Therefore, Father has waived any issue concerning the goal change. *See In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citing *Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006)).

record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

- 8 -

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Father's parental rights pursuant to section 2511(a)(1), (2), (5), (8) and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under sections 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 10 -

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Although Father's brief contains an appropriate discussion of the law referencing the subsections of 2511(a), he simply claims that the evidence supporting the termination of his parental rights was not clear and convincing. Moreover, he "argues he successfully completed his parenting course, was employed, had suitable housing and had visited [Children]." Father's brief at 14. Thus, he states that "there was insufficient evidence to demonstrate [he] wanted to relinquish his parental rights to his [C]hildren as evidenced by his actions and the goals that he had accomplished." *Id.* Specifically, with regard to subsection (a)(2), he again asserts that he testified "that he had completed a parenting course, was employed, had housing and had been visiting." *Id.* at 15.

The trial court's opinion contains the following discussion relating to the facts that it found relative to subsection (a)(2):

> Child 1 has been in DHS care since November 2016, and Child 2 has been in DHS care since April 2017. Father's SCP objections were to address dual diagnosis drug and alcohol issues, parenting, domestic violence, obtain stable housing, obtain stable employment, and maintain a relationship with Children. Father's objectives have been the same for the life of the case and Father

was aware of his objectives. Father never engaged in drug and alcohol or mental health treatment throughout the life of the case. Father missed scheduled dual diagnosis assessments and never gave an explanation to CUA as to why he missed the scheduled appointments. Father claimed that he did attend a scheduled dual diagnosis assessment and was informed that he did not need any treatment. The trial court did not find Father's testimony credible. Father has been called to complete random drug screens, but Father failed to appear for any random drug screens. Father admitted that he did not appear for his random drug screens because he had marijuana in his system. Father completed a forthwith drug screen in June 2017 and tested positive for marijuana. Father successfully completed parenting [classes] at the ARC on November 21, 2017. Father never attended any domestic violence programs and never provided an explanation to CUA as to why he failed to engage. CUA indicated that Father previously had appropriate housing, but Father moved to a new home at a later date. Father never provided CUA with a copy of the lease for his new home and never set up an appointment for CUA to evaluate the new home. Father claimed that he has been living in a three-bedroom house for the past year and pays $500 per month in rent. Father has never provided verification of his employment to CUA, although he claimed that he is employed. Father claimed that he has started a new job with a previous employer and prior to starting that job, Father claimed that he worked for his uncles doing electric, construction, and cleaning work under the table. Father has not visited Children since March 2018, although Father was ordered to attend biweekly visits at the agency for two hours. Father never graduated past supervised visits with Children because Father has never complied with his drug and alcohol objective. When Father would attend visits with Children, the visits were appropriate. Father indicated that he was not attending visits because he could not deal with the emotional detachment from Children after the visits. Father admitted that he also failed to communicate with Children outside of the scheduled visits because he did not believe communication was appropriate. The CUA case manager indicated that although Father completed parenting, there is a concern regarding Father's parenting because Father has failed to maintain visits with Children. The CUA case manager rated Father's compliance with SCP objectives as minimal. Father has failed to maintain consistent contact with CUA throughout the life of the case. Children need permanency, which Father cannot provide. Father has demonstrated that he is unwilling to remedy the causes of his

incapacity to parent in order to provide Children with essential parental care, control or subsistence necessary for their physical and mental well-being.

TCO at 9-10 (citations to the record omitted).

Having reviewed the record, we conclude that it supports the findings of the trial court that Father has not provided Children with the essential parental care, control and subsistence necessary for their mental and physical well-being, and that Father is unable or unwilling to remedy the causes of his parental incapacity, neglect or refusal. While the trial court noted Father's few positive accomplishments, it is clear that Father will not, or cannot, become a capable parent for Children at any point in the foreseeable future. Thus, we conclude that DHS has carried its burden of proving the statutory grounds for termination under subsection 2511(a)(2). Father is not entitled to relief.

Next, we consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(b). We have discussed the required analysis under section 2511(b) previously in this memorandum. *See In re Adoption of J.M.*, 991 A.2d at 324. Father's argument centers on the fact that although the CUA case worker testified that his visits with Children were appropriate, the trial court's suspension of his visitation with Children did damage to his bond with Children. Moreover, he claims that no bond assessment was performed, which he asserts was required. Thus, he argues that his parental rights should not have been

- 13 -

terminated in that the evidence was insufficient to support the termination order.

Initially, we note that section 2511(b) does not require a formal bond analysis. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Moreover, expert testimony is not required, rather, a social worker or caseworker can evaluate whether a bond exists with a biological parent and/or with a foster parent. *Id.* Additionally, the record does not support Father's claim that the court suspended his visitation. In fact, because Father did not meet his SCP objectives, his visitation remained supervised and was not suspended. Additionally, we look to the trial court's discussion of the facts contained *supra* in this memorandum and its further summary, wherein it stated:

> As the record reflects, Children are currently placed together in a foster home. Children have a strong parent-child bond with their foster parent. Children look to the foster parent for their everyday needs. Children have been with this foster parent for the life of the case. Child 2 has lived with this foster parent since he was born. Children see the foster parent as their mother. It is in the Children's best interests to be adopted. Children need stability and security from a parent who is an active part of their day-to-day life, which Father is unable to provide. Children would not suffer any irreparable harm if Father's parental rights were terminated since Father has detached himself from creating a bond with Children. Father has not had any contact with Children since March 2018. Due to Father's failure to maintain any visitation with Children, Father and Children no longer have a parent-child bond. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Father. The DHS witness was credible.

TCO at 15-16 (citations to the record omitted).[5]

We have reviewed the record and conclude that the trial court's findings and conclusions are supported by the evidence before the court. Thus, we determine that DHS has carried its burden regarding section 2511(b). Again, Father is not entitled to relief.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/29/19</u>

---

[5] The trial court noted the appointment of counsel for Children who participated in the proceedings on their behalf. However, due to the ages of Children at the time of the hearing (Child 1 was 27 months old, Child 2 was 15 months old), they were unable to advocate their own wishes. Therefore, no conflict existed between Children's best interest and their preferred outcome. *See In re T.S.*, 192 A.3d 1080, 1090 (Pa. 2018).